# UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

TREIG and HEATHER WOOD          )
                                )          AMENDED COMPLAINT
    Plaintiff,              )
                                )          Case No. 2:11-cv-00020-EJL
                                )
vs.                             )
                                )
WELLS FARGO HOME MORTGAGE;      )          **U.S. COURTS**
WELLS FARGO BANK, N.A.; WELLS   )
FARGO FINANCIAL; WELLS FARGO    )          FEB 2 3 2011
BANK; WELLS FARGO AND COMPANY,  )
NORTHWEST TRUSTEE SERVICES,     )          Rcvd_____Filed_____Time_____
FEDERAL HOME LOAN MORTGAGE      )          ELIZABETH A. SMITH, CLERK
CORPORATION; CHARLES E. HALDEMAN, )        CLERK, DISTRICT OF IDAHO
Jr., IN HIS CAPACITY AS CHIEF   )
EXECUTIVE OFFICER OF FEDERAL    )
HOME LOAN MORTGAGE CORPORATION  )
                                )
    Defendants.             )
                                )
_____)

## NOTICE OF FILING
## AMENDED COMPLAINT

Treig and Heather Wood, Plaintiffs, file this amended complaint and say as follows:

All the allegations from the first complaint are included in this amended complaint. Northwest Trustee Service and in his capacity as CEO of Freddie Mac, Charles E. Haldeman are also Defendants in this case.

Respectfully submitted on the _____23rd_____ day of February 2011.

_____
                 Treig Wood

1.    Defendant failed to comply with the Truth in Lending Act, 15 U.S.C. 1601 *et. seq.*.

2.    Defendant failed to comply with 12 U.S.C. 1701 *et. Seq.* (the "National Housing Act").

3.    Plaintiff's banking institution exists but for the good will of the American taxpayer's including irrespective of and in partial return for this bailout, Defendant has certain obligations to, among others, its customers, its shareholder, the United States Government, the American citizenry, and the Defendants.  As demonstrated herein, Defendant has breached these obligations causing damage to the Plaintiff's and to others.

4.    As demonstrated below, Defendant's actions include violations of Federal Law including, but not limited to, the Real Estate Settlement Procedures Act, 12 U.S.C.§§ 2601 *et. seq.* ("RESPA"), the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639 2601 *et. seq.* ("HOEPA"); the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et. seq.* ("FCRA"), the Truth in Lending Act, §§ 15 U.S.C. 1601 *et. seq.* ("TILA") as well as violations of common law, including but not limited to breach of contract, defamation, negligence, fraud, fraudulent inducement, and negligent infliction of emotional distress; and state statutory law including, but not limited to, Idaho State Law

STATEMENT OF FACTS

I.   The Financial Crisis

6.      Over the last three years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages are in foreclosure or default.[1]

7.      Many experts agree that the current economic crisis was a result, in part, of a bubble in the housing market.  Many experts also agree that the bubble was inflated by the actions of Wall Street banks like the Defendants.  In recent years, that bubble burst.

8.      Before the bubble burst, lending standards and practices were loosened; banks like the Defendant were able to make loans to homebuyers with little or no money down and without verifying borrowers' ability to pay back the bank.

9.      Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

10.     The foreclosure crisis is not over.  Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011.[2]

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at http://cop.senate.gov/reports/library/report- 100909-cop.cfm.

## II. Plaintiff's Contribution To The Economic Crisis

11. Upon information and belief, further inflating the housing bubble, banks like the Defendant created vehicles to package risky mortgages and sell them en masse as security investments.

12. Upon information and belief, banks like the Defendant bundled hundreds of different mortgages into instruments called Collateralized Debt Obligations ("CDOs"). Upon further information and belief, by design, the CDOs included high risk mortgages. Banks like the Defendant then marketed the CDOs on the premise that, because a portion of the bundled mortgages would turn out to be low risk, the inclusion of the high risk mortgages was not a threat to the investment quality of the CDOS. In other words, the CDO, as a whole, was sound. Consequently, despite the inclusion of high risk mortgages, the CDOs turned into "AAA-rated" investments.

13. Additionally, upon information and belief, at the same time, banks like the Defendant purchased insurance policies from companies like AIG to provide insurance known as "credit default swaps" on the CDOs. In essence, the credit default swaps were bets between banks like the Defendant and the insurers on whether the borrowers whose loans were included in the CDOs would default or not.

14. The hyper activity in the housing market spurred by banks like the Defendant caused home prices to artificially spike. Consequently, the housing

---

[2] *See*. Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, Figure 30 *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

market crashed acting as a catalyst for the succeeding economic recession and crisis.

### III. HAMP

15.  The United States Department of Treasury created the Home Affordable Modification Program ("HAMP") pursuant to its authority under the Troubled Asset Relief Program ("Tarp").[3]  The purpose of HAMP is to, among other things, stem the foreclosure crisis rampant in this country by providing affordable loan modificationsions and other alternatives to foreclosure for eligible borrowers like Plaintiffs.  Under the terms of HAMP, the Treasury Department provides financial incentives for participating lenders like Defendant to reduce homeowners' monthly mortgage payments to affordable levels.

16.  The goal of a HAMP mortgage modification is for the homeowner to receive a modification of a first-lien loan such that monthly mortgage payments are reduced to 31% of the borrowers' monthly income for the next five years.

17.  A HAMP modification consists of two stages, first, a participating loan servicer like Defendant is required to gather information and, if appropriate, offer the borrowers a "Trial Period Plan".  Second, upon successful completion of the Trial Period Plan, the loan servicer must offer the borrowers a permanent modification.

18. To participate in HAMP, loan servicers enter into contracts with the Federal National Mortgage Association ("Freddie Mac") in its capacity as an

---

[3] *See*, Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, §101, 122 Stat. 3765 (October 3, 2008).

agent of the United States Government.

19.  Section 1(A) of the HAMP Agreement incorporates by reference the "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac.

20.  Under the HAMP Supplemental Directive issued April 6, 2009, "participating servicers are required to consider all eligible mortgage loans unless prohibited by the rules of the applicable [Pooling and Servicing Agreement] and/or other investor servicing agreements"

21.  Defendant's obligations as a participant in HAMP are specified in Supplemental Directive 09-01.  Defendant must make a threshold determination of whether the borrower meets basic eligibility criteria for HAMP.  These criteria include a determination that there was no previous HAMP modification of the subject loan, the borrowers are in default or likely to default, the borrowers live in the subject home, the current monthly payments are above 31% of the borrowers' gross income, and the borrower is experiencing financial hardship.

22.  Should the borrower meet these eligibility criteria, Defendant is required to conduct a "waterfall" test.  To do so, Defendant applies the modification steps enumerated in Supplemental Directive 09-01, in the order of succession, until the borrowers' monthly mortgage payment ratio is reduced to 31% of the borrowers' monthly income.  The steps include reducing the applicable interest rate applied to the loan, extending the terms of the loan and/or adding a "balloon payment" and the end of the term.

23.  Defendant then completes a "net present value" ("NVP") test to see if these modified terms would put the investor in a better financial outcome than if the

property proceeded to foreclosure. If the NVP test yields a "positive" outcome (i.e. the value of completing modification exceeds the value of foreclosing on the property), Defendant "must offer" the trial modification under HAMP. If the NVP test yields negative results (i.e. the value of completing a modification is less than the value of foreclosing),

24.Defendant must provide the borrower with an opportunity to correct the NPV input values or any other information identified in the Notice that the borrower believes is in error. The servicer may not conduct a foreclosure sale for 30 calendar days from the date of the Non-Approval Notice or a longer period, if required, to review supplemental material provided by the borrower in response to the Notice.

25. The Non-Approval Notice must also contain a toll-free number, email address, and mailing address of a servicer representative if the borrower wishes to dispute the reasons for non-approval. For larger servicers, the servicer representative listed in the notice must be independent from the servicing staff that made the under-writing decision. Additionally, the Non-Approval Notice must include a telephone number for the HOPE™ Hotline, a 24-hour telephone hotline that provides assistance to borrowers at no charge.

26. The notice must specifically encourage borrowers to ask for MHA Help if they have any reason to dispute the contents of the Non-Approval Notice. Requests for Reconsideration or Re-Evaluation if a homeowner who applies to participate in HAMP is not approved for a loan modification because the servicer's analysis indicates a negative result from the HAMP NPV test, the Non-Approval Notice sent to that borrower must include an explanation of the NPV analysis and the following list of NPV inputs for that borrower:

• funds paid principal balance on the loan

• interest rate

• months delinquent

• next reset date and interest rate (for adjustable rate mortgages) current principal and interest payment (before modification)

• monthly insurance payment

• monthly real estate taxes

• monthly homeowners' association fees (if applicable)

• borrowers' monthly gross income

• borrower's total monthly obligations

• borrower credit score

• co-borrower credit score (if applicable)

• zip code

• state

27.  As of February 1, 2011, the program will require the servicer to provide the borrower with additional inputs, including the following:

• value of the property the servicer used in the NPV test

• type of property valuation

• data collection date

• imminent default status indicator

• investor code

• UPB at origination

• first payment date at origination

• mortgage type

• remaining term

- mortgage coverage insurance percentage

- date NPV evaluation was conducted

- UPB of the proposed HAMP modification (net of forbearance and principal

reduction)

- interest rate of proposed HAMP modification

- amortization term of the proposed HAMP modification

- principal and interest payment of the proposed HAMP modification

- principal forbearance amount of the proposed HAMP modification

- principal forgiveness amount of the proposed HAMP modification

- modification fees paid by the investor

- mortgage insurance partial claim amount

28.  Defendant has routinely failed to meet its obligations under HAMP and the

Supplemental Directives.  Borrowers, including Plaintiff's, who request to be evaluated for a

HAMP modification routinely face unexplained delays and go weeks and even months with

no communication from Defendant after providing the requested information.

29.  Borrowers including the Plaintiff's who attempt to contact Defendant by

telephone face long periods of time on hold and are transferred between service

representatives until they often give up and terminate the call.  Borrowers, including

Plaintiff's, routinely attempt to contact Defendant by written letter.  These letters often go

unanswered and when they are answered, it is often weeks and months after the letters were

transmitted.  Defendant regularly falsely informs borrowers that it did not receive requested

information and demands that documents be re-sent.  Defendant routinely fails to inform

borrowers of the reason for a delay or denial of a loan modification by, for example, stating

that the borrower's income is "too low" but failing to specify what documents that determination is based on, and/or stating that the Defendant's did not receive enough documents.

30. In administering its obligations under HAMP, Defendant's employees are routinely uninformed about the regulations they are charged with administering, the circumstances of the individual borrowers' finances, loan and the history of the borrowers' HAMP application. Worse yet, in administering its obligations under HAMP, Defendant's employees routinely lie about the HAMP requirements and fail to distinguish such requirements from the Defendant's own internal modification criteria.

31. One of the great frustrations with HAMP, as expressed by legislators, consumer advocates, oversight bodies, and even Treasury itself, has been the abysmal performance of loan servicers, which not only operate as the point of contact for distressed homeowners seeking to participate in the program but also administer the loans on behalf of the investors.

32. Anecdotal evidence of their failures has been well chronicled. From the repeated loss of borrower paperwork, to blatant failure to follow program standards, to unnecessary delays that severely harm borrowers while benefiting servicers themselves; stories of servicer negligence and misconduct are legion, and the servicers' conflicts of interest in administering HAMP they too often have financial interests that don't align with those of either borrowers or investors.

## IV    The Wood's And The HAMP Application

33. Treig and Heather Wood live in their home, a single family home located at 7904 Balta Lane Coeur d'Alene, ID (the "Family Home") with their 5 year old son and 9 year old daughter. They purchased the Family Home in September 2007.

34.  Upon information and belief, Defendant sold, conveyed or assigned the alleged subject mortgage and loan to Freddie Mac through a Pooling and Servicing Agreement (the "PSA").  Accordingly, upon information and belief, pursuant to the PSA, the alleged subject mortgage belongs to Freddie Mac not to Defendant.

35.  Defendant, upon information and belief, currently services the alleged subject mortgage.

36.  Due, in part, to the burst of the housing bubble, the rapid decline in the financial markets, the resulting national economic recession and freezing of the credit markets, in September 2007, Mr. Wood lost his job as Vice President of North American Sales, for a company Headquartered out of Eden Prairie, MN. As demonstrated herein, Plaintiff's role in inflating the housing bubble contributed to these economic calamities.

A.  The First HAMP Application

37.  After losing his job, Mr. Wood started his own company doing the exact same type of sales that his former employer does. Mr. Wood struggled to start his new business during one of the worst national economic times since the Great Depression. To that end, on or about July 16, 2010, Plaintiff's submitted to Defendant a completed "Borrowers Assistance Form" (the "First HAMP Application").

38.  Soon thereafter, Mr. Wood was initially told by Defendant's "Loan Modification Department" that they did not have the ability to confirm whether or not the Borrowers Assistance Form was even received but that he should wait to be contacted by Defendant.

39. Then, after not having been contacted, Plaintiff connected with Defendant's "Home Retention Solutions" whom identified a David Duke" as the "Loss Mitigation Specialist" assigned to Plaintiffs' account. Plaintiff faxed several "required" documents to Defendants. Plaintiff was then told by Defendant to check back in a couple of weeks to verify all documents have been received.

40. Plaintiff called on August 2, 2010 to inquire about status and was forwarded to Crystal Wines, another "Loss Mitigation Specialist" phone number 877.279.1649 ext #1641and left her a voice mail. Plaintiff called Defendant again, August 4th, August 5th, August 6th, all leaving voice mails, with no return calls.

41. Sometime thereafter, Plaintiff spoke with Debra Stillwatlre, she informed us that we were in the HAMP program and that our file was being handled by a "special team", and that she had no idea how long it would take to get an answer.

42. September 18, 2010, Plaintiff called Defendant and spoke with another "Home Preservation Specialist" Anita, to follow up with Plaintiff's HAMP application and was told that Plaintiff's were still in review, but to send updated document. Plaintiffs faxed all documents again the very same day.

43. September 27th, 2010 Plaintiff received a phone call from Defendant informing us that we were "kicked out" due to Mrs. Wood's name not appearing on the original loan papers, and that it was a "Freddie Mac" problem and not the Defendant's. Defendant informed us that we needed to submit a letter to Defendant stating that Mrs. Wood's income should be considered for our HAMP application and to fill out the application again and fax it along with all the other

documents we previously faxed. Plaintiff's faxed the authorization letter, second (2) HAMP application along with all other documents on September 29, 2010.

B.  The Second HAMP Application

44.  Sometime thereafter, Plaintiff received a call from another one of Defendants "Home Preservation Specialist" and was informed that we were "kicked out" of the HAMP program due to insufficient paperwork and/or documents.

45.   October 12, 2010 Plaintiffs found posted to the front door of their family home, a notice of foreclosure.

46.  October 19, 2010 Plaintiff's called Defendant and spoke to another "Home Preservation Specialist" named Nicole, to inquire about any and all of the thirty (30) "In House" modifications that we were told that the Defendant's could offer, as well as requested the negative NPV Non-Approval Notice, which the Plaintiff's have yet to receive.  Nicole and Mr. Wood went over all the documents that the Plaintiff's have been faxing and the Defendants confirmed that they had all faxed documents.  Nicole informed Mr. Wood that when she ran the latest numbers off our Financial Worksheet and the Profit and Loss Statement, that the Plaintiffs were pre-approved for one of the 30 "in house" modifications, and that all the Plaintiff's would have to do is Western Union an amount of $4,853.58 to Defendant.  Plaintiffs did Western Union the full amount of $4,853.58 to Defendant on August 26, 2010.

47.  Plaintiff called Defendant on August 27, 2010 and spoke with Collett Jones to confirm that the Defendant received the funds, Defendant confirmed.

48.  November 1, 2010 Plaintiff called Defendant and spoke with Collett Jones

for a status update with the new modification process. Collett Jones informed

Plaintiff that the same documents needed to be faxed again due to misplacement

of documents by Defendant. Plaintiff faxed yet again all the documents.

49. November 2, 2010, Plaintiff called Defendant and spoke with "Chris" and

Chris confirmed that the Defendant did receive all the faxed documents.

50. November 8, 2010, Plaintiff called Defendant spoke with "Terrina" for a

status update on modification, Terrian did not know anything about the

modification and forwarded Plaintiff's call to "Sarah", in "Lost Mitigation",

Sarah informed Plaintiff that all documents needed were in their possession, and

just to keep checking back.

51. November 17, 2010 Plaintiff called and spoke with a lady who spoke so fast

that Plaintiff did not catch her name. She informed the Plaintiff that they were

not in any modification program and Plaintiff then asked about the $4,853.58 that

Plaintiff's had sent, that got them approved for the modification, Defendant said

it was a "mistake" and that the funds were not applied to Plaintiff's loan, but

rather setting in a non interest bearing account until the Defendants can figure out

with to do with it. Plaintiff's then requested the monies be sent back and they

again said it would just sit in the non-interest bearing account until the

Defendants figure out what to do with it.

52. December 20, 2010 Plaintiff called Defendant and spoke with "Shawna" to

see if there was any other options, Shawna said it is the Defendant's goal to help

there customers stay in their homes. Shawna told me to fax all previous

documents again and that the Defendant's would look at getting Plaintiffs into

one of, over thirty (30) in house modifications. That same day Plaintiffs faxed all required documents again.

53.   January 6, 2011 Plaintiffs called Defendants and spoke with Cashanda Rhonda who was the Plaintiffs new "Home Preservation Specialist" Cashanda required that we fax all updated documents.  Plaintiffs faxed all documents again that day.

54.   January 14, 2010 Plaintiffs called Defendant this time spoke with "Rose", Plaintiff asked to speak with Cashanda Rhonda and was informed by Rose that she did not have her phone number and/or extension number, because Cashanda did not put her contact information on the Plaintiff's file.  Rose advised Plaintiff that they should call back in a couple of days to see if Cashanda had put her contact information on Plaintiff's file.

55.   January 18th, 2011 Plaintiff received a call from Defendant by the name of Collett Jones, and she informed Plaintiff that Defendant required all faxed documents again as they do not have any updated documents on file.  Plaintiff faxed all documents to Defendant again.

56.   January 25, 2011 Plaintiff received a call from Defendant by the name of "Andrew Shilter" who suggested the Plaintiffs accept Defendant's "Temporary Forbearance".   Plaintiff told Mr. Shilter that they would consider the proposed forbearance but that they would of course need to review the terms of any such agreement

57.   On or about February 3, 2010, Plaintiffs received from Defendant a proposed "Special Forbearance Agreement".  In response thereto, on or about February 7,

2010, Mr. Wood spoke to Defendant rejecting Special Forbearance Agreement due to the terms, specifically payment number four the "balloon" payment due on May 12, 2011 in the amount of $29,199.46.

V.  Defendant's Collection Tactics, and Customer Relations

A.  Defendant's Collection Tactics

58.  Persistent throughout the time in which the HAMP Applications were pending, Defendant engaged in a harassing and humiliating debt collection campaign against the Plaintiffs.

59.  Defendant's collection representatives, were routinely uninformed, naïve of the facts, rude and harassing.  They called almost every day despite the fact that the HAMP Applications were pending, a point Mr. Wood raised with every call.

60.  Worse yet, Wells Fargo collection representatives, in an effort to collect an allegedly delinquent debt, routinely lied about the status of the loan, the applicable laws and regulations under which Wells Fargo was required to operate and the actions Wells Fargo took or intended to take with regard to the loan.

**Defendant's Customer Care and the Statements and Promises of its Leadership**

70.  The popular term "Too-Big-To-Fail" which so often is applied to Wells Fargo may also prove to mean "Too-Big-To Care".

71.  Since submission of the First HAMP Application, Plaintiffs have communicated with many Wells Fargo representatives, have received many letters in the mail and have had many letters, phone calls and requests go

unanswered. It is apparent that Wells Fargo is either unwilling or incapable of giving its customers (at least its distressed customers) the individualized attention they deserve.

72. Most letters and notices received from Wells Fargo were form letters. Thus, these communications were almost never responsive to the issues Plaintiffs raised.

73. Plaintiffs submit that Defendant possesses a culture of indifference and often hostility towards its retail customers. At the same time, Defendants leadership spins its public image by misstating its activities, initiatives and policy.

## COUNT ONE
### (Declaratory and Injunctive Relief)

74. Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

75. Defendant failed to provide separate Plaintiffs with legitimate and non-predatory access to the debt management and relief that must be made available to borrowers

76. Upon information and belief, Defendant's non-compliance with the conditions precedent to foreclosure imposed on Plaintiff is an actionable event that makes the filing of this action for foreclosure premature based on a failure of a contractual and/or equitable condition precedent.

77. Upon information and belief, Defendant failed, refused or neglected to comply, prior to the commencement of this action, with the servicing obligations specifically imposed on Plaintiff in many particulars, including, but not limited to:

a) Defendant failed to service and administer the subject alleged mortgage and loan in compliance with all applicable federal state and local laws.

b) Defendant failed to service and administer the alleged subject mortgage and loan in accordance with the customary and usual standards of practice of mortgage lenders and servicers

c) Defendant failed to extend to Plaintiffs the opportunity and failed to permit a modification, waiver, forbearance or amendment of the terms of the alleged subject loan.

78. Plaintiff's have a right to receive foreclosure prevention loan servicing from Defendant before the commencement or initiation of this foreclosure action.

79. Plaintiff's are being denied and deprived by Defendant of their right to access the required troubled mortgage loan servicing imposed on Plaintiff's and applicable to the alleged subject mortgage and loan by the National Housing Act

80. As a proximate result of Defendant's unlawful actions set forth herein, Plaintiff's continue to suffer irreparable harm for which monetary compensation is inadequate.

81. Based on the foregoing, Plaintiff's are entitled to a declaratory judgment dismissing the Foreclosure, declaring that the Defendant is legally obligated to provide Plaintiff's with access to the special troubled loan servicing prescribed by the National Housing Act and enjoining the Defendant from charging foreclosure fees and costs and from commencing or pursuing this foreclosure until such servicing is provided to Plaintiff's, for attorney's fees and for all other relief to which Plaintiff's prove themselves entitled.

## COUNT TWO
### (Additionally and/or Alternatively, Breach of Contract)

82. Plaintiff's repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

83.  Defendant's conduct detailed above including, but not limited to, executing the HAMP Agreement constitutes a valid offer to all eligible borrowers, including Plaintiffs, to fairly participate in consideration for HAMP

84.  Defendant, by way of its participation in HAMP and the signing of the HAMP Agreement, made a representation and offer to Plaintiff's that if they applied and qualified for HAMP, they would receive a HAMP modification.

85.  By completing and executing the HAMP Applications and returning same to Defendant along with the necessary and supporting documentation, Plaintiff's, accepted Defendants offer to be fairly considered for inclusion in HAMP.

86. Alternatively, Plaintiffs' return of the HAMP Applications constitutes an offer. Acceptance of this offer occurred when Defendant received the HAMP Modification Applications and measured it against the HAMP criteria.

87.  The terms of this agreement included, among other things, for the Plaintiff, inclusion in HAMP should they meet the criteria.  For Defendant; under HAMP, $1,000.00 for each HAMP modification from the United States Government as well as the explicit guarantee of the performance of the alleged subject loan.

88.  Moreover, by inducing Plaintiffs to apply for consideration in HAMP, Defendant caused Plaintiffs to give up the ability to pursue other means and strategies of saving the Family Home.

89.  Plaintiffs met the HAMP criteria.

90.  Defendants and Plaintiffs thereby formed a valid contract.

91.  To the extent that the contract was subject to a condition precedent providing Defendant an opportunity to review the documentation submitted by Plaintiff's

when they returned the HAMP Applications, this condition was met.

92. Plaintiffs qualify for a HAMP modification. By failing to offer such a HAMP modification, Defendant breached the contract and its promise to give such a modification to its qualifying customers.

93. Plaintiffs remain ready, willing and able to perform under the contract by entering into a HAMP modification.

94. Plaintiffs have suffered harm and are threatened with additional harm from Defendant's breach. By agreeing to participate in HAMP, Plaintiff's have foregone other remedies that might be pursued to save the Family Home, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with the alleged default, such as selling their home.

**COUNT THREE**
**(Additionally and/or alternatively, Breach the Implied**
**Covenant of Good Faith and Fair Dealing)**

95. Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

96. Defendant is obligated by contract, common law, statute, regulation and/or rule to act in good faith and to deal fairly with Plaintiffs.

Defendant routinely and regularly breached this duty by, among other things:

a. failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs;

b. failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

c. routinely demanding information it has already received;

d. making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP;

e.    failing to follow through on written and implied promises;

f.    failing to follow through on contractual obligations;

g.    materially misrepresenting applicable law, regulations and standards as relates to the alleged subject mortgage and loan;

h.    attempting to induce Plaintiffs to enter into a forbearance agreement which gives them no more rights than that to which they are already entitled under Idaho State law;

i.    failing to give a HAMP modification and/or another foreclosure alternative to Plaintiffs; and

j.    allowing its CEO, "Home Preservations Specialists", "Loss Mitigation Specialist", and/or other employees to represent that Wells Fargo would work with its customers in need of help.[4]

97.  As a result of these failures to act in good faith and the absence of fair dealing, Defendant caused Plaintiff's harm.

## COUNT FOUR
### (Additionally and/or alternatively, Promissory Estoppel)

98.  Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

99.  Defendant, by way of its participation in HAMP and the signing of the HAMP Agreement, made a representation to Plaintiffs that if they applied and qualified for HAMP, they would receive a HAMP modification.

100.  The HAMP Agreement was intended to induce borrowers including the Plaintiffs to rely on it and thereby participate in HAMP.

101. Plaintiffs did indeed rely on Defendant's representations, by submitting the HAMP Applications and foregoing other means and strategies to save the Family Home.

---

[4] The foregoing is not an exhaustive list.  Thus, Plaintiffs reserve the right to supplement or amend this list as is necessary and permissible.

102.  Given the language in the HAMP Agreement, the media coverage of the government's efforts to stop the foreclosure crisis and the actions and statements of Wells Fargo, Plaintiffs' reliance was reasonable.

103. Plaintiffs' reliance was to their detriment. Plaintiffs have yet to receive a HAMP modification and have lost the opportunity to fund other strategies to save the Family Home.

**COUNT FIVE**
**(Additionally and/or alternatively, Implied Contract)**

104.  Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

105.  Through its course of conduct detailed herein, Defendants formed a contract with Plaintiffs to modify the alleged subject loan and mortgage.

106.  The course of conduct includes but is not limited to:

      a.   Entering into the HAMP Agreement; and

      b.   Wells Fargo advice to their customers that, if they found themselves underwater, they should call Wells Fargo for help.

107.  Plaintiffs relied on this implied contract by submitting the HAMP Application and foregoing other alternative means and strategies to save the Family Home.

108. Given the language in the HAMP Agreement, the media coverage of the government's efforts to stop the foreclosure crisis and the actions and statements of Wells Fargo, Plaintiffs' reliance was reasonable.

109.  Plaintiffs' reliance was to their detriment.  Plaintiffs have yet to receive a HAMP modification and have lost the opportunity to fund other strategies to save the Family Home.

110. Defendant breached the implied contract by failing to offer Plaintiffs a HAMP modification despite their qualifications for such.

111. Plaintiffs have suffered damages as a result.

### COUNT SIX
### (Additionally and/or alternatively, Fraud)

112. Plaintiff's repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

113. Defendants made material misrepresentations of fact to Plaintiffs including, but not limited to:

    a.  that in order to be eligible for a loan modification Plaintiffs' account must be delinquent;

    b.  that, if eligible, the subject alleged mortgage and loan would be modified;

    c.  that no foreclosure action would be taken while a HAMP Application was pending;

    d.  that a foreclosure action had been instituted when it had not;

    e.  that if any Wells Fargo customers, including Plaintiff's, were "underwater" and unable to pay their mortgage payment to call Wells Fargo and that Wells Fargo would work with them to keep their home;

    f.  that because Mr. Wood used a hostile tone while on the phone with Wells Fargo representative the HAMP Modification application would be rejected;

    g.  that loans owned by Freddie Mac were ineligible for HAMP modification;

    h.  that it had not received requested documents when in fact it did;

    i.  that Plaintiffs inquiries would be addressed, calls would be returned and letters would be responded to;

    j.  that Plaintiffs' Second HAMP Modification Application was ineligible for modification under HAMP because "[t]he documentation [Plaintiffs] submitted contain[ed] asset information that makes [Plaintiffs] ineligible for the program requested";

k.  that the income stated in Plaintiffs HAMP Application "does not support" Plaintiffs' request for a HAMP Modification;

l.  that Wells Fargo does not author original letter to its customers and that any letters sent or to be sent to Plaintiffs were or will be form letters;

m.  that Wells Fargo is "at the forefront in doing everything [it] can to help families meet their mortgage obligations"; and

n.  that Wells Fargo will "attempt to explore every avenue for borrowers in helping them keep their homes"[5].

Defendant's representations were false in that:

a.  a borrower does not have to be in default in order to be eligible for a loan modification;

b.  even though eligible, Defendant failed and refused to modify the subject alleged mortgage and loan;

c.  this foreclosure action was commenced while a HAMP Application was pending;

d.  a foreclosure action had not been instituted at a time when Chase represented that it had;

e.  Wells Fargo did not work with Plaintiffs to keep them in their Family Home;

f.  the HAMP Applications were not rejected because of Mr. Wood's tone;

g.  Wells Fargo did receive documents it claimed not to have;

h.  Plaintiffs' inquiries were not addressed, calls were not returned and letters were not responded to;

i.  the documentation Plaintiffs submitted with the Second Application did not make Defendants ineligible;

j.  the income stated in Plaintiffs' First and Second HAMP Application did support Plaintiffs' request for a HAMP modification;

k.  Wells Fargo does in fact author original letter to its customers;

l.  Wells Fargo is not at the forefront in doing everything it can to help families meet their mortgage obligations;

---

[5] The foregoing is not an exhaustive list.  Thus, Plaintiffs reserve the right to supplement or amend this list as is necessary, and permissible.

m. Wells Fargo will not and has not attempted to explore every avenue for borrowers in helping them keep their homes.

114. Defendant's representations were intentional or reckless.

115. Defendant's representations were material.

116. As the servicer of Plaintiffs' alleged loan, Defendant should have known that Plaintiffs would rely on its representations.

117. Plaintiffs relied on Defendant's representations.

118. Given the language in the HAMP Agreement, the media coverage of the government's efforts to stop the foreclosure crisis the actions and statements of Wells Fargo, Plaintiffs' reliance was reasonable.

119. Plaintiffs' reliance was to their detriment. Plaintiffs have yet to receive a HAMP modification and have lost the opportunity to fund other strategies to save the Family Home.

120. Plaintiffs have suffered damages as a result.

## COUNT SEVEN
### (Additionally and/or alternatively, Negligent Misrepresentation)

121. Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

122. Plaintiffs first contacted Defendant about a loan modification in or about July 2010.

123. Defendant knew or should have known that it had special expertise and a sophisticated understanding of loan servicing, loss mitigation, loan workout and restructuring than Plaintiffs especially as relates to HAMP and related legislation.

124. Defendant knew or should have known that Plaintiffs would rely on it to protect their interests is securing loan modifications to save the Family Home.

125.  Further, Defendant knew or should have known that Plaintiffs would rely on the words and testimonies of their employees that Wells Fargo was committed to working with its customers to save their homes.

126.  The representations delineated above were made knowingly false, recklessly false or negligently false.

127.  Defendant's representations were material.

128.  As the servicer of Plaintiffs' alleged loan, Defendant should have known that Plaintiff's would rely on its representations.

129. Plaintiffs relied on Defendant's representations.

130.  Given the language in the HAMP Agreement, the media coverage of the government's efforts to stop the foreclosure crisis the actions and statements of Wells Fargo including those of its CEO, "Home Preservations Specialists", "Loss Mitigation Specialist", and/or other employees to represent that Wells Fargo would work with its customers in need of help Plaintiffs' reliance was reasonable.

131.  Plaintiffs' reliance was to their detriment. Plaintiffs have yet to receive a HAMP modification and have lost the opportunity to fund other strategies to save the Family Home.

132. Plaintiffs have suffered damages as a result.

## COUNT EIGHT
### (Additionally and/or alternatively, RESPA, 12 U.S.C.§§ 2601 *et. Seq.*)

133. Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

134. Upon information and belief, the alleged subject mortgage is a "federally related mortgage loan" as defined in Respa.

135. "The principal purpose of RESPA is to protect home buyers from material nondisclosures in settlement statements and abusive practices in the settlement process." *Cortez v. Keystone Bank, Inc.,* Civ. A. No. 98-2457, 2000 WL 536666, at *10 (E.D. Pa. May 2, 2000).

136. RESPA applies both to the actual settlement process and to the "servicing" of any "federally related mortgage loan." Id. (citing 12 U.S.C. § 2602(1)). Under RESPA, the servicer of a "federally related mortgage loan," is required to provide a written response within twenty days of receiving a "qualified written request" for information about the servicing of such a loan unless the action requested is taken within that period. *Id.* (*citing* 12 U.S.C. § 2605(e)(1)).

137. Further, RESPA requires the servicer to "take corrective action within sixty days of receiving the request or to conduct an investigation and provide the borrower with a written explanation of the reasons for the action and the name and telephone number of an employee of the servicer to whom the borrower can direct any further inquiry on the matter." *Id.* (citing 12 U.S.C. § 2605(e)(2)).

138. Upon information and belief, Wells Fargo is the servicer of the subject alleged mortgage and loan.

139. During the pendency of the HAMP Applications, Plaintiff made information requests of Defendant which amount to qualified written request (the "Qualified Written Requests").

140. Defendant defaulted in its obligations under Respa by failing to timely

respond to the Qualified Written Requests.

141.  Defendant's breach resulted in actual damages suffered by Plaintiffs including but not limited to emotional pain, suffering, emotional distress and loss of the opportunity to fund other strategies to save the Family Home.

## COUNT NINE
### (Additionally and/or alternatively, TILA, §§ 15 U.S.C. 1601 *et seq*)

142.  Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

143.  At the time of the alleged subject transaction, Wells Fargo acted as a creditor who regularly engaged in the making of mortgage loans, payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, whether in connection with loans, sales of property or services, or otherwise. Accordingly, the alleged subject loan was made subject to TILA and its implementing regulations, Federal Reserve Board Regulation Z, 12 C.F.R. § 226.

144.  Upon information and belief, as a result of the alleged subject transaction, Defendant acquired an interest in Plaintiffs' primary dwelling, the Family Home, that secures payment or performance of an alleged obligation.

145.  Upon information and belief, this alleged consumer credit transaction violated the disclosure requirement of TILA and Regulation Z by underdisclosing charges for Plaintiffs' alleged loan.

146.  Upon information and belief, this alleged consumer credit transaction violated the disclosure and rescission requirements of TILA and Regulation Z by, among other ways, failing to provide two copies of the notice of the right to

rescind and an accurate date for the expiration of the rescission period.

147.  Upon information and belief, this alleged consumer credit transaction, because of conflicting representations, failed to make required disclosures clearly and conspicuously in writing in violation of TILA and Regulation Z and therefore failed to deliver all "material" disclosures as required by the TILA and Regulation Z.

148.  The TILA violations described herein give Plaintiffs an extended right to rescind the alleged loan. Plaintiffs are also entitled to an extended right of rescission against any assignees of the alleged subject loan.

149.  Upon information and belief, this alleged consumer credit transaction also violates the disclosure requirements of TILA and Regulation Z by failing to provide either an adequate itemization of the amount financed, a qualified substitution for the itemization of the amount financed, or a statement that Plaintiffs had a right to request such an itemization.

150.  As a result of the aforesaid violations of TILA and Regulation Z, Defendant is liable to Plaintiffs for:

      a.  the return of any money or property that has been given to anyone in connection with the alleged transaction;

      b.  the termination of Defendant's alleged security interest in the Family Home;

      c.  actual damages in an amount to be determined at trial;

      d.  statutory damages as provided by 15 U.S.C. § 1640;

      e.  costs and disbursements; and

      f.  attorneys' fees.

**COUNT TEN**
**(Additionally and/or alternatively, HOEPA, 15 U.S.C. § 1639 *et. seq.*)**

151.  Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

152.  HOEPA is an amendment to TILA and offers further protections for high rate mortgages, as defined by 15 U.S.C. § 1602(aa)(1)(B)(i), Federal Reserve Board Regulation Z, 12 C.F.R § 226.32.

153.  A mortgage that is a credit transaction secured by the consumer's principal dwelling and whose "total points and fees" exceed eight percent of the total loan amount is a high rate mortgage within the meaning of the HOEPA. 15 U.S.C. § 1602(aa)(1)(B)(i). The definition of "points and fees" includes "*all* compensation paid to mortgage brokers." 12 C.F.R. § 226.32(b)(1)(ii) (emphasis added).

154.  The subject alleged consumer credit transaction was allegedly secured by Plaintiffs' principal dwelling.

155.  The subject alleged loan transaction is subject to HOEPA because, upon information and belief, among other things, the total points and fees payable by Plaintiffs exceeded eight percent of the total loan amount.

156.  Upon information and belief, the subject alleged consumer credit transaction violated HOEPA and Regulation Z by, among other things,

> a. failing to provide Plaintiffs with the disclosures required under HOEPA at least three business days prior to the consummation of the alleged transaction;
>
> b. extending credit without regard to Defendants' ability to pay the debt.

157.  These violations of HOEPA and Regulation Z give Plaintiff a statutory right to rescind the loan.

158. Any assignees of the loan are liable for all claims that Plaintiffs assert pursuant to 15 U.S.C. § 1641(d).

159. As a result of the aforesaid violations of TILA and Regulation Z, Plaintiff is liable to Defendants for:

> a. the return of any money or property that has been given to anyone in connection with the alleged transaction;
>
> b. the termination of Defendant's alleged security interest in the Family Home;
>
> c. actual damages in an amount to be determined at trial;
>
> d. statutory damages as provided by 15 U.S.C. § 1640;
>
> costs and disbursements; and
>
> e. attorneys' fees.

**COUNT ELEVEN**
**(Additionally and/or alternatively, Idaho Code § 48-603)**

160. Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

161. The actions taken by Defendant relating to the HAMP Applications detailed herein were, upon information and belief, willfully and maliciously deceiving and misleading and constitutes an unfair, misleading and deceptive trade practice.

162. The actions taken by Defendant relating to the creation, bundling, marketing and sale of CDOs detailed herein were, upon information and belief, willfully and maliciously deceiving and misleading and constitutes an unfair, misleading and deceptive trade practice.

163. As authorized by the Idaho Deceptive Trade Practices Act, Plaintiffs seek an order from this Court enjoining Defendant from the unlawful actions and

practices under the Deceptive Practices Act described herein.

As a result of its violations of the Idaho Deceptive Practices Act, Defendant is liable to Plaintiffs for:

      a.  actual damages;

      b.  statutory damages as provided by § 48-603

       treble damages as provided by § 48-603

      c.  costs and disbursements; and

      d.  attorneys' fees.

### COUNT TWELVE
### (Additionally and/or alternatively, Defamation)

164.  Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

165.  Upon information and belief, Defendant defamed Plaintiffs by reporting incorrect information that Defendant knew or should have known was false, to one or more national credit reporting agencies.

166.  Upon information and belief, Defendant knew or should have known Plaintiffs did not owe an alleged debt they reported to the credit reporting agencies because Defendant knew or should have known that the alleged debt was void, rescinded or otherwise unenforceable as detailed herein.

167.  Upon information and belief, Defendant knew or should have known that the information it reported to the national credit reporting agencies would negatively impact Plaintiffs' ability to enter into consumer contracts. In fact, the very purpose of reporting negative information to a credit reporting agency is to give other creditors a basis to deny favorable credit terms, contracts, and other

opportunities to that consumer.

168. Furthermore, upon information and belief, Defendant's continued failure to correct the information in Plaintiffs' credit report continue to harm Plaintiffs' reputations and their ability to enter into favorable contracts. Plaintiff's continued failure to correct the incorrect information in Plaintiffs' credit reports has resulted in multiple instances of defamation every time any company or other organization obtains a copy of Plaintiffs' credit history.

169. Defendant's actions are defamatory under either a per-se or a per-quod definition. Defendant's derogatory information reported in Plaintiffs' credit history incorrectly insinuate that Plaintiffs are not competent in handling their financial affairs.

170. Plaintiffs have been damaged as a result of Plaintiff's actions.

## COUNT THIRTEEN
**(Additionally and/or alternatively, Libel)**

171. Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

172. Upon information and belief, Defendant libeled Plaintiffs by causing to be published incorrect information that Defendant knew or should have known was false, with one or more national credit reporting agencies.

173. Upon information and belief, Defendant knew or should have known Plaintiffs did not owe an alleged debt they caused to be published with the credit reporting agencies because Defendant knew or should have known that the alleged debt was void, rescinded or otherwise unenforceable as detailed herein.

174. Upon information and belief, Defendant knew or should have known that

the information it caused to be published would negatively impact Plaintiffs' ability to enter into consumer contracts. In fact, the very purpose of reporting negative information to a credit reporting agency is to give other creditors a basis to deny favorable credit terms, contracts, and other opportunities to that consumer.

175.  Furthermore, upon information and belief, Defendant's continued failure to correct the information in Plaintiffs' credit report continues to harm Plaintiffs' reputations and their ability to enter into favorable contracts.

176.  Defendant's continued failure to correct the incorrect information in Plaintiffs' credit reports has resulted in multiple instances of libel every time any Plaintiffs' credit reports were published.

177.  Defendant's actions are libelous under either a per-se or a per-quod definition.  Defendant's derogatory information reported in Plaintiffs' Credit History incorrectly insinuates that Plaintiffs are not competent in handling their financial affairs.

178.  Plaintiffs have been damaged as a result of Plaintiff's actions.

### COUNT FOURTEEN
**(Additionally and/or alternatively, Negligent Injury to Reputation)**

179.  Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

180.  Defendant came into possession of Plaintiffs' private credit information and had a duty to exercise reasonable care in safeguarding that information.

181.  Defendants owed a duty to Plaintiffs to, among other things, properly: (i)

supervise its employees; (ii) monitor the use and disclosure of Plaintiffs'
consumer information; and/or (iii) adopt procedures to prevent or detect the
disclosure of inaccurate or false consumer information.

182.  Upon information and belief, Defendant, through its actions, breached its
duties to Plaintiffs.

183.  Upon information and belief, Defendant reported incorrect information that
Defendant knew or should have known was false, to one or more national credit
reporting agencies.

184.  The breaches of these duties were reasonably foreseeable to Defendant.

185.  But for Defendant's breach of duties, Plaintiffs' credit information would
not have been wrongly reported. Upon information and belief, Plaintiffs' credit
information was wrongly reported as a direct and proximate result of Defendant's
breach.

186.  Plaintiff's suffered damages as a result of Defendant's conduct.

## COUNT FIFTEEN
### (Additionally and/or alternatively, FCRA, 15 U.S.C. § 1681m)

187.  Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as
though fully set forth herein.

188.  The FCRA is designed to regulate the use of information for consumer
credit, employment, insurance, and certain other purposes in a manner that is fair
and equitable to the consumer, with regard to the confidentiality, *accuracy*,
relevancy, and proper utilization of such information.

189.  Plaintiffs are "consumers," as defined at 15 U.S.C. § 1681a(c).

190.  Upon information and belief, Defendants is an entity who, regularly and in

the course of business, furnishes information to one or more Credit Reporting

Agencies ("CRAs") about its transactions or experiences with any consumer and

Defendant constitutes a "furnisher," as codified at 15 U.S.C. §1681s-2.

191.  Upon information and belief, all actions taken by Defendant were done with

malice, were done willfully, and were done with either the desire to harm

Plaintiffs and/or with the knowledge that its actions would very likely harm

Plaintiffs and/or that their actions were taken in violation of the FCRA.

192.  Upon information and belief, Defendant furnished Plaintiffs' credit

information to one or more CRAs despite the fact that it had reasonable cause to

believe that the information was inaccurate.

193.  All of the violations of the FCRA proximately caused injuries and damages

as set forth herein.

194.  Moreover, with regard to the HAMP Applications, upon information and

belief, Defendant took adverse action based on information it obtained from third

parties other than CRAs including, but not limited to Defendant's corporate

affiliates and from Plaintiffs themselves.

195.  Upon information and belief, credit for personal, family, or household

purposes involving Plaintiffs was denied either wholly or partly because of

information obtained from a person other than a CRA bearing upon the Plaintiffs'

credit worthiness, credit standing, credit capacity, character, general reputation,

personal characteristics, or mode of living.

196.  Upon information and belief, Defendant failed, within a reasonable period

of time, upon the Plaintiffs' request for the reasons for such adverse action

received within sixty days after learning of such adverse action, to disclose the nature of the information to Plaintiffs.

197.  Upon information and belief, Defendant failed to clearly and accurately disclose to Plaintiffs their rights to make such written request at the time such adverse action was communicated to the Plaintiffs.

198.  Upon information and belief, Defendant failed to make additional disclosures required of it under the FCRA.

200.  Plaintiffs have been damaged by Defendants's actions.  As a result, Plaintiffs are entitled to actual damages sustained or statutory damages of not less than $100 and not more than $1,000, as well as punitive damages, litigation costs, and attorney's fees.

## COUNT SIXTEEN
### (Additionally and/or alternatively, FCRA, 1681s-2)

201. Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

202. Plaintiffs are "consumers," as defined at 15 U.S.C. § 1681a(c).

203.  Defendant is an entity who, regularly and in the course of business, furnishes information to one or more CRAs about its transactions or experiences with any consumer and Defendant constitutes a "furnisher," as codified at 15 U.S.C. §1681s-2.

204.  Upon information and belief, all actions taken by Defendant were done with malice, were done willfully, and were done with either the desire to harm Plaintiffs and/or with the knowledge that its actions would very likely harm Plaintiffs and/or that their actions were taken in violation of the FCRA.

205.  Upon information and belief, Defendant furnished credit information regarding Plaintiffs to CRAs despite the fact that it knew or had reason to know that such information was inaccurate.

206.  Upon information and belief, Defendant regularly and in the ordinary course of business furnishes information to one or more CRAs about transactions or experiences with Plaintiffs; and has furnished to a CRA information about Plaintiffs but failed to promptly notify such CRA that it furnished false or inaccurate information about Plaintiffs or any additional information that is necessary to make the information provided by Defendant to the CRA complete and accurate.

207.  Moreover, upon information and belief, Defendant furnished negative information to a CRA regarding credit extended to Plaintiffs but failed to provide a notice of such furnishing of negative information, in writing, to Plaintiffs.

208.  Defendant's actions detailed herein violate the FCRA.

209.  All of the violations of the FCRA proximately caused the injuries and damages set forth in this Complaint.

210.  Plaintiffs have been damaged by Defendant's actions.  As a result, Plaintiffs are entitled to actual damages sustained or statutory damages of not less than $100 and not more than $1,000, as well as punitive damages, litigation costs, and attorney's fees.

### COUNT SEVENTEEN
### (Additionally and/or alternatively, Negligence)

211. Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as though fully set forth herein.

212.  Defendant has a duty to evaluate borrowers whose loans they service with a

reasonable level of care for inclusion in HAMP and other modification programs

and to qualify appropriate borrowers in a timely fashion.

213.  Defendant breached this duty to Plaintiffs by telling Plaintiffs that they did

not qualify for HAMP and other programs when they did.

214.  Defendant further breached this duty to Plaintiffs by failing to provide them

modifications for which Plaintiffs qualified within reasonable time frames.

215.  Defendants' breach of duty caused Plaintiffs to suffer serious and ongoing

damages including, but not limited to, the threatened loss of the family home,

financial harm to credit and extensive anxiety and emotional distress.

## COUNT EIGHTEEN
### (Additionally and/or alternatively, Negligent Infliction of Emotional Distress)

216.  Plaintiffs repeat, reallege and reiterate each of the foregoing paragraphs as

though fully set forth herein.

217.  Defendant improperly serviced Plaintiffs' alleged subject loan in a manner

that caused emotional distress by, *inter alia*, and as more fully set forth herein,

disconnecting, repeatedly transferring, refusing to transfer, or otherwise

mishandling phone calls from Defendants; threatening to deny or delay loan

modifications; filing foreclosure, threatening to file foreclosure, stating that

foreclosure had been filed when it had not; advising Plaintiffs to short-sell their

Family Home; attempting to induce Plaintiffs to enter into a forbearance

agreement which gave them no more rights than that to which they were already

entitled, repeatedly requiring Plaintiffs to provide documents they had already

provided; reporting Plaintiffs' accounts as being in default; notifying Plaintiffs

they did not qualify for a loan modification when they did; refusing to give a loan modification and various other misstatements of fact, deceits and acts of underhanded trickery.

218.  Upon information and belief, Defendant acted intentionally, recklessly, knowingly and/or negligently in causing Plaintiffs' emotional distress, or Defendant should have known that its actions would result in Plaintiffs' suffering serious emotional distress.

219.  Defendant's conduct was extreme and outrageous.

220.  As a direct and proximate cause of Defendant's intentional, reckless and/or negligent infliction of emotional distress, Plaintiffs have suffered humiliation, distress, depression and anxiety.  The loss of their financial well being, further harm to their credit and the threatened loss of the Family Home are serious sources of emotional distress.

221.  As a result, Defendant is liable to Plaintiffs for actual and punitive damages which continue to accrue.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in its favor and grant the following relief:

(a) Resend Mortgage

(b) Grant a HAMP Modification

(c) Require the defendants to process all "in house" modification and/or refinance.

(d) Grant relief for all claims raised in this complaint

(e) Grant relief as the court sees fit

(f) To Stay the Foreclosure

<u>Certificate of Service</u>

I, Treig Wood certify that on the _23ʳᵈ_ day of February 2011, a true and

correct copy hereof was served upon the attorney for the defendant and defendants by

both overnight mail and facsimile transmission to:

Kenneth C. Howell
Hawley Troxell Ennis and Hawley LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Facsimile: 208.954.5226

Northwest Trustee Services, INC
P.O Box 997
Bellevue, WA 98009
Facsimile:  425.586.1997

Charles Haldeman Jr.☐
CEO☐Freddie Mac☐
8200 Jones Branch Dr.
McLean, VA 22102-3110☐
Fax: 703-903-4045

_____
Treig D. Wood